[Civ. No. 20093. Second Dist., Div. Three. Oct. 28, 1954.]

P. & J. ARTUKOVICH, INC. (a Corporation), Respondent, v. CHARLES RAY SIMPSON et al., Appellants.

McFadden, Turner & Owens and Claude M. Owens for Appellants.

Stephen Monteleone for Respondent.

WOOD (Parker), J.—Action for damages for breach of contract. In a nonjury trial, judgment was for plaintiff. Defendants appeal from the judgment. ·

Appellants contend that plaintiff cannot recover damages because plaintiff breached the contract first; and that the court erred in finding the plaintiff did not breach the contract.

Plaintiff made a contract with the City of Los Angeles, Department of Water and Power, to lay a 72-inch water pipe (concrete) under Figueroa Street from Santa Barbara Avenue to Olympic Boulevard. The contract provided that holes for the pipe were to be bored under certain intersections on Figueroa Street (in order to avoid traffic congestion). Defendants Simpson and Cochell, who were doing business as Pacific Coast Boring Company, a copartnership (referred to as "Pacific"), entered into a subcontract with plaintiff whereby Pacific was to do the boring under the intersections.

The hole-boring operation is described as follows: A boring pit is dug at a side of an intersection from which the boring is to be done. The pit is of such dimensions that men can work therein and that a section of steel casing (about 10 feet long) and a boring jack can be placed therein. The jack, which is power-driven and works on a hydraulic principle, is operated so as to force the steel casing horizontally along the line where the pipeline is to be placed. As the casing is pushed forward, there are men inside the casing who dig the dirt, which is at the forward end of the casing, into the casing and move it back through the casing into the pit. Then the dirt is put in trucks by a crane and is hauled away. After one section of casing is pushed as far forward as the jack will extend, another section of casing is welded to the first section and then the jack pushes the two sections forward.

Welding additional sections of casing continues until the hole under the intersection is completed. Then concrete pipe is placed inside the steel casing, and the pit is filled.

The subcontract, which was made on July 6, 1951, provided in part:

"Section 2. The Subcontractor and the Contractor agree that the materials to be furnished and work to be done by the Subcontractor are

"Subcontractors will furnish all equipment to excavate the boring pits, handle the casing and jack the casing into place at all locations as shown on the plans.

"Subcontractors will dispose of the excess material from the jacking, operations, cover the pit with plates at night and load the excess dirt from the boring pit into trucks furnished by the contractor.

"The contractor will furnish the trucks to haul the excess material from the boring pit excavation (loading to be done by subcontractor) furnish compressor and pavement breaking crew to cut the pavement, barricades, plates and signs.

"Section 3. The subcontractor agrees to complete the several portions and the whole of the work herein sublet by the time or times following: Starts July 9, 1951 and complete the several portions in coordination with general contractor so as to not delay the job.

"Section 4. The Contractor agrees to pay the Subcontractor for the performance of his work the sum of $150.00 for each pit and $18.50 for each foot of jack casing, in current funds, subject to additions and deductions for changes as may be agreed upon, and to make payments on account thereof in accordance with Section 5 hereof.

"Subcontractor to invoice on first of each month with payment to be made by contractor on 10th of each month.

"Subcontractor will furnish Performance and Material bond. Bond fee to be paid by General contractor."

Pacific began work on July 9, 1951. About July 6 or 7, before Pacific began the work, Mr. Harter, the project engineer for plaintiff, told Mr. Charles Simpson, one of the partners in Pacific, that plaintiff could not get trucks. Simpson replied that he could get them—"you stand the cost of them." Harter said that plaintiff would stand the cost if Pacific could get an extra truck. Pacific started work at the Santa Barbara Street crossing. It dug a boring pit about 14 feet deep, according to the specifications of plaintiff's engineers, and then it bored about 2 feet when it struck a water or gas pipe.

Mr. Harter and the engineers for the water project then instructed Pacific to ''lower'' the pit in order to miss that pipe. Simpson testified that at said time he asked Harter about the extra cost ''on this hole,'' and that Harter told him to ''keep track of your time and bill Artukovich for it,'' and ''we'll see that you get your money.'' Pacific pulled the boring rig (jack) from the pit; drove the timbers, which supported the sides of the pit, deeper into the ground; dug the pit 2 feet deeper; and reset the jack. This extra work required about two days and was done on July 12 and 13. After Pacific had bored a 79-foot hole under the Santa Barbara intersection it started work at the Exposition Boulevard intersection. The engineer for plaintiff marked the place, north of the intersection, where Pacific should dig the pit and begin the boring. Pacific proceeded according to those instructions, and ran into more pipes. Then plaintiff's engineers decided to make the bore pit on the south side of the intersection. Then Pacific filled the pit, which it had made on the north side, and dug a pit on the south side. This extra work was done on July 28 and 29. Then Pacific bored a 51-foot hole under that intersection.

Pacific furnished some of the trucks that were used to haul the dirt; and plaintiff furnished some of the trucks.

On July 30, 1951, Pacific sent a bill to plaintiff for the extra work at the Santa Barbara intersection in the amount of $366.08. On July 31, Pacific sent a bill to plaintiff for the extra work at the Exposition intersection in the amount of $326.43. Also on July 31, Pacific sent a bill to plaintiff for $1,727.86, which consisted of: $1,467.66 for boring the 79 feet under the Santa Barbara intersection; $235.20 for trucks furnished by Pacific on July 9, 10, 27, 30 and 31; and $25 for the faithful performance bond. Under the provisions of the contract payments for work done were due on the 10th of the month following the month in which the work was done. Plaintiff did not pay any part of these bills by August 10. Under the contract, charges for extra work were not payable until the Department of Water and Power had approved the charges. The charges for the extra work were not approved by said department until approximately two months after the bills were sent to plaintiff.

On August 11, Simpson asked Jones, the office manager of plaintiff, about paying the bills. Simpson testified that Jones replied that Pacific would have to wait for the check until Jones could do something about it. Simpson also testi-

fied that on August 12 he talked with Harter about getting the money; Harter said he would see if he could do any good about it; on August 13, he talked to Jones again about the money, but no payment was made; on August 14, he talked to Harter again about the money, and Harter told him that if he were Simpson and could not get the money he would pull off the job. On August 15, plaintiff sent a check to Pacific for $1,819.09, which was in payment of the items of $1,467.66 (boring under Santa Barbara intersection), $25 (for bond), and $326.43 (extra work at Exposition). That check did not include payment of the $235.20 bill for trucks furnished by Pacific or the $366.08 bill for extra work at Santa Barbara. The check was received by Pacific on August 16. Jones testified that the reason he did not make such payment prior thereto was that he was waiting for the faithful performance bond to be delivered to plaintiff; that he had written to Pacific on July 23 regarding the delivery of the bond. Simpson testified that he delivered the bond to plaintiff the last of July.

Also on August 16, Pacific received a bill from plaintiff for $478.08 for rental of trucks furnished by plaintiff to Pacific after July 15. Simpson testified that on August 17, he went to plaintiff's office and asked Jones what the bill was for; Jones replied that was for the truck Pacific had been hauling that excess dirt with; Simpson said that the contract did not call for that, and "you fellows are supposed to furnish these trucks for hauling this dirt"; Simpson asked Jones why plaintiff did not pay the trucking bill which Pacific had presented; Jones replied that he was going to see later what could be done about the trucks and which way the contract read; the next day (August 18), when they were still arguing about plaintiff's bill for the trucks, Jones said, "You are to pay the bill. We are not supposed to furnish the trucks." Jones testified that he told Simpson that the plaintiff was not to pay for the dump truck rental, that Pacific "was to furnish the dump truck for hauling the excess dirt from the jacking operation,"—that under the contract Pacific "was to haul the material for the jacking operation." Simpson also testified that he told Jones on August 18 that if Pacific did not get the money it had coming on the extras and the trucks it was going to pull off the job. On August 18, Pacific stopped performance of the contract.

On August 20, Pacific sent a bill to plaintiff for $1,315.50, which consisted of: $943.50 for boring the 51 feet under Expo-

sition Boulevard; $150 for digging the pit at Exposition; $150 for digging the pit at Santa Barbara; and $72 for use of the truck. That bill was not payable until the 10th of the following month (September 10), and plaintiff did not pay it because (according to testimony of Jones) Pacific had abandoned the job before the bill became payable.

Jones testified that in the latter part of August, after Pacific had left the job, he told Simpson that Pacific was delaying the job and it should go back to work; Simpson replied that the price he was getting was not enough and he wanted more money; Jones said that the contract called for so much a foot and that was what he should do it for; several days later Jones told Simpson that if he did not get back on the job, plaintiff would have to do the work; Simpson replied that he would not do it until he got an adjustment in his contract; he inquired about the money due him; Jones said there would be no adjustment, he would have to do the work for the price stated in the contract, and that no money was due him. Simpson testified that he did not recall having such a conversation with Jones.

Mlagenovich, plaintiff's superintendent, testified that he asked Simpson why he was not working; Simpson replied that he was not getting enough money; Mlagenovich said that he would like to see Simpson return to work and he would watch his method of working to see if something was wrong in his method, and if his method was all right and he was not able to come out financially he (witness) would try to obtain more money for him; Simpson said he had a bill that had not been paid. Simpson testified that Mlagenovich asked him if he would come back to work if plaintiff would rewrite a contract; Simpson replied that if he could get his money he would write another contract.

On September 11, 1951 (Tuesday), plaintiff sent a telegram to Pacific stating that if the boring operation is not commenced "This Thursday at 8 A M" plaintiff would take over the work and complete the contract charging Pacific with the excess cost, if any.

Defendants (appellants) alleged in the answer that the refusal of plaintiff to pay Pacific excused performance by Pacific; that plaintiff assigned its rights under the contract to plaintiff's bonding company because plaintiff was insolvent; that by reason of plaintiff's insolvency and failure to pay, plaintiff breached the contract, and Pacific was unable to pay out the money necessary for the performance of its obliga-

tions under the contract; and that plaintiff was not the real party in interest because it had so assigned the contract.

The court found, in part, as follows: On August 18, 1951, Pacific abandoned the further performance of the contract without cause. Thereupon, plaintiff notified Pacific and Pacific's surety to proceed with the work. Pacific failed to comply therewith, and plaintiff thereupon proceeded with the work and completed it on April 16, 1952. Pacific is responsible for all damages sustained by plaintiff by reason of Pacific's breach of contract; and Pacific's surety is liable to the extent of $2,500, the amount of the bond. Plaintiff, in completing the contract, expended the reasonable sum of $9,776.25 over and above the contract price, after allowing Pacific credit for $1,916.78, which credit includes trucks furnished by Pacific to plaintiff, and which plaintiff was required to furnish. Plaintiff performed all the requirements of the contract except the requirement that plaintiff furnish trucks. As to said requirement, plaintiff was to furnish the trucks used in connection with the performance of work by Pacific under the contract, but, instead, plaintiff billed Pacific for some of the trucks of plaintiff which were used in connection with the work. Pacific submitted a bill to plaintiff for work done in July. Although plaintiff did not pay for that work until August 15, the withholding of payment (after August 10) was not without justification but plaintiff was justified in withholding payment due to delay by Pacific in delivering to plaintiff a faithful performance bond; and as to extra work performed in July, the same was not due, under the terms of the contract, on August 10. Plaintiff was not insolvent and unable to pay any balance for work done in July '' (except the balance due for trucks furnished by defendants in July, 1951),'' and it was not unable to pay for work done in August. By reason of the abandonment of the contract by Pacific, plaintiff was not required to make any payment pursuant to the terms of the contract. It is not true that plaintiff without justifiable cause refused to make payments, except plaintiff did not make payments for trucks furnished by Pacific in July. There was no excuse for failure on the part of Pacific "in continuing with the performance" of the contract. Plaintiff did not assign all of its interest in the contract to its bonding company and plaintiff was not insolvent. Plaintiff assigned to its bonding company any money which was or might be earned by plaintiff in performing the contract. Plaintiff is the real party in interest in this action.

Judgment was for plaintiff against Pacific for $9,776.25; and against Pacific's surety company for $2,500 (the amount of its bond).

As above stated, appellants (Pacific) contend that plaintiff cannot recover damages because plaintiff breached the contract first in that plaintiff failed to pay, as provided in the contract, for work done, and failed to furnish trucks as provided in the contract.

As to the bills for extra work, payment therefor was not due on August 10, because under the contract such payment was not due until the bills were approved by the Department of Water and Power. Those bills were not so approved until approximately two months after they were presented. As to the bills which were due on August 10, for other work done in July, the court found that the withholding of payment (until August 15) was due to Pacific's delay in delivering the faithful performance bond. On August 16, Pacific accepted a check which included $1,467 for boring work done in July, and $25 for the bond. As to the furnishing of trucks, as provided in the contract, it appears that before commencing work Pacific agreed orally to get trucks, and plaintiff agreed orally to stand the cost of them. Pacific did get some trucks and used them in hauling the dirt. Plaintiff also made some trucks available for hauling the dirt and Pacific used them. Pacific sent a bill to plaintiff for $235.20 for rental of trucks obtained and used by Pacific. Plaintiff asserts that its reason for not paying the bill was that Pacific was to furnish the trucks for hauling the dirt removed from the boring operation (as distinguished from the dirt removed in digging the pit). Even if it be assumed that the contract provided, as Pacific contends, that plaintiff was to furnish trucks for hauling all the dirt from the pit whether it was dirt removed in digging the pit or in boring under the intersections, Pacific agreed orally to get some trucks and relied upon plaintiff to pay for the rental of them. There was no provision in the written contract with reference to paying for trucks. Under the circumstances here where Pacific undertook to furnish, and did furnish, trucks which under the contract were to be furnished by plaintiff, it cannot be said that plaintiff breached the written contract by failing to pay for the trucks according to the oral agreement. The oral agreement was not a substitute for, or an addition to, any provision of the written agreement. Even if, upon some theory, it could be said that the oral agreement became a part of the written agreement there

was no provision in the oral (or written) agreement as to the rate of compensation for use of trucks or as to the time when payment should be made. A failure by plaintiff, under such circumstances, to pay a bill for use of trucks could not be regarded as a breach of the written contract. The reasonableness of such a bill, or the time for paying it, might properly be questioned by plaintiff. If a failure to pay such a bill were a breach of the written contract, it would seem that plaintiff, in order to avoid a claim of breach of the written contract, would be required to pay the bill regardless of its reasonableness. The failure by plaintiff to pay for the use of the trucks was not a breach of the contract.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.